## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| |
|---|
| BEVERLY HILLS SUITES LLC, et al, |
| |
|      Plaintiff, |
| |
|      v. |
| |
| TOWN OF WINDSOR LOCKS, et al., |
| |
|      Defendant. |

No. 3:12-cv-00871 (MPS)

### MEMORANDUM OF DECISION

From 2007 to 2010, the plaintiffs, a hotel and its principal, Sharok Jacobi, hosted parties, rap music concerts, gatherings of "swingers," and other events at their facility in Windsor Locks, Connecticut, in addition to renting rooms to guests. Some of these events attracted boisterous crowds, and the Windsor Locks police were summoned several times in response to noise complaints and reports of criminal activity, including fights and, on at least one occasion, a shooting. The police also referred the hotel to the Liquor Control Division of the Connecticut Department of Consumer Protection, as well as the Windsor Locks Fire Marshal, for alleged liquor and fire code violations—reports that prompted investigations by those authorities and led to temporary shut-downs of the hotel and its bar, as well as the arrest of Jacobi.

In this action, the plaintiffs claim that the defendants—a police officer, the police chief, and the Town of Windsor Locks—targeted them for enforcement activities based on animus against the plaintiffs' customers and entertainers—young, African-American and Hispanic people—and members of the swingers' groups who congregated for parties at the hotel and its bar. The hotel claims that the defendants harmed its business and asserts violations of First

Amendment rights of free expression and association, selective enforcement in violation of the Fourteenth Amendment, deprivation of due process rights in violation of the Fourteenth Amendment, and "warrantless searches" by the police in violation of the Fourth Amendment. Jacobi sues for false arrest and malicious prosecution.

I grant the defendants' motion for summary judgment as to all claims. The First Amendment claims fail because the swingers' activity documented in the record—namely, participating in sexual encounters with others in the hotel's bar—is not protected by the First Amendment, and because the record does not contain any evidence that the defendants prevented or "chilled" any concerts. The selective enforcement claim fails because the plaintiffs have introduced no evidence that any other hotels in Windsor Locks demanded as much police attention or were otherwise similarly situated. The procedural due process claim fails because there is no evidence that the defendants improperly influenced the independent decisions by the Liquor Control Division and the Fire Marshal to shut down the bar and hotel, respectively, and thus no evidence that the defendants deprived the plaintiffs of property or liberty interests. The Fourth Amendment claim fails because the only evidence in the record about police visits to the hotel to which either side has pointed shows that the police were either summoned by hotel staff or were present in areas of the hotel—such as the bar and front desk—to which the hotel invited the public and in which it thus had no reasonable expectation of privacy. Finally, Jacobi's false arrest claim fails because the police had probable cause to arrest him, and the statements he contends were omitted from the arrest warrant affidavit were either immaterial or unknown to the police.

I.    **BACKGROUND**

    **A. The Amended Complaint**

Sharok Jacobi is the sole trustee of the Windsor Locks Family Trust, and the Trust is the

sole member of Beverly Hills Suites, LLC, which owns the Beverly Hills Suites (hereafter

referred to as the "Hotel").[1] The Hotel and Jacobi have brought an eight-count complaint against

the Town of Winsor Locks (the "Town"), John T. Suchocki, Jr., the chief of the Windsor Locks

Police Department ("WLPD"), and Detective Sergeant Richardo Rachele (together, the

"Defendants"). (Am. Compl., ECF No. 69-2.) Plaintiffs are suing Suchocki and Rachele in both

their individual and official capacities. (*Id.* ¶ 10-11.) Invoking 42 U.S.C. § 1983, the Hotel brings

claims against all Defendants for violations of its free speech and free association rights under

the First Amendment (Count One), the equal protection clause of the Fourteenth Amendment

(Count Two), the due process clause of the Fourteenth Amendment (Count Three), and its right

to be free from warrantless searches and seizures under the Fourth Amendment (Count Four).

The Hotel also brings a claim against all Defendants for attorney's fees (Count Six) and against

the Town for municipal liability for Rachele's alleged constitutional violations (Count Five).

Jacobi brings claims against all Defendants for false arrest and malicious prosecution (Count

Seven). Finally, Plaintiffs bring claims for violations of the Constitution of the State of

Connecticut (Count Eight).

---

[1] In the original Complaint (ECF No. 1), the Windsor Locks Family Trust was listed as a plaintiff, but it
alleged no claims. In the Amended Complaint (ECF No. 69-2), the Windsor Locks Family Trust is not
listed as a plaintiff, and the Plaintiffs' brief makes no mention of any claims by the Windsor Locks
Family Trust. Therefore, the Court dismisses any claims by the Windsor Locks Family Trust and
terminates it as a party.

### B. Complaints and Disturbances at the Hotel -- Generally

The following facts are taken from the parties' statements of material fact pursuant to Local Rule 56(a) and their supporting exhibits. (*See* Defendants' L.R. 56(a)(1) Statement, ECF No. 32-4 ("Defs.' SMF"); Plaintiffs' Response to Defendant's L.R. 56(a)(1) Statement, ECF No. 41-1 ("Pls.' SMF").)

The Hotel purchased the premises in Windsor Locks in 2004, and was generally not operational until 2006, when it had a "soft opening," while it was still undergoing renovations. (Defs.' SMF ¶¶ 1, 4; Pls.' SMF ¶¶ 1, 4.) The Hotel's grand opening occurred in April of 2007. (Defs.' SMF ¶ 5; Pls.' SMF ¶ 5.) The Hotel contained a club/lounge that served alcohol, which was known as "Club 91" (Defs.' SMF ¶ 2; Pls.' SMF ¶ 2) prior to December 2008, after which it was renamed "Windsor Lounge." (Pls.' SMF ¶ 7.) A single road served as the only access road for both the Hotel and an adjacent residential condominium association. (Defs.' SMF ¶ 3; Pls.' SMF ¶ 3.) In September, 2010, a receiver was appointed to operate the Hotel. (Defs.' SMF ¶ 6; Pls.' SMF ¶ 6.)

The parties agree that between 2007 and September 2010 there were no other venues in the Town "that held nighttime parties/events with a comparable volume of people." (Defs.' SMF ¶ 24; Pls.' SMF ¶ 24.) The Plaintiffs, however, dispute Defendants' evidence that there was no other venue in the Town "that contacted the police for assistance with anywhere near the frequency as" the Hotel, and that the WLPD "had to request mutual aid from other police departments" to serve the Hotel on numerous occasions. (Defs.' SMF ¶ 24 (citing Rachele Aff. ¶ 28-29); Pls.' SMF ¶ 24 (citing Jacobi Decl. ¶ 5).)[2] Defendants, relying on Rachele's affidavit,

---

[2] Plaintiffs simply deny the statements in Rachele's affidavit, and fail to cite any admissible evidence to the contrary. Plaintiffs also state that, on several occasions, Rachele requested aid from other police departments, "but that such police officers from other departments openly expressed their opinions that

assert that between 2007 through 2010, the WLPD received "multiple loud noise complaints pertaining to the hotel." (Defs.' SMF ¶ 8.) Plaintiffs do not dispute this statement, but assert that most of the loud noise complaints "came from one lady that lived in the condominium complex next to the hotel." (Pls.' SMF ¶ 8.) According to the testimony of one of the Hotel's managers, Jennifer Feigenbaum, "[t]he same woman" made such calls, and called the police to complain about noise even when the Hotel did not have events. (Pls.' Ex 1, ECF 89-1, Feigenbaum Tr. at 84.)

According to Rachele's affidavit (based on his personal knowledge and his review of police incident reports prepared by WLPD officers) and several of his police reports, the following incidents at the Hotel required police attention from 2007 to 2010[3]:

- On June 6 and June 9, 2007, the WLPD responded to the Hotel on noise complaints of loud music from area residents. (Pls.' Ex. B, Narrative Police Report 07-4992, ECF No. 91 at 12.)

- On August 25, 2007, a manager at the Hotel called the WLPD to complain about a large group of 15-20 people arguing and throwing bottles, and requested police assistance. (Defs.' Ex. C, Rachele Aff. ¶ 6.)

- One week later, the WLPD was "again contacted concerning a report of a large fight involving 25 people." (*Id*. ¶ 7.)

- On September 29, 2007, there was a disturbance at Club 91 with possible shots fired. (*Id*. ¶ 8.)

---

these requests were wholly unnecessary." (Pls.' SMF ¶ 24.) Plaintiffs cite paragraph 5 of Jacobi's Declaration, which does not contain such a statement, and contains no information that counters Defendants' evidence, except for Jacobi's vague statement that "[a]s far as I observed and learned as . . . manager in the ordinary course of business, the hotel staff did not often call for police assistance with respect to matters involving hotel customers, employees or otherwise except on a limited as needed basis consistent with the type or number of calls for police help made by a typical hotel of the same size." (Jacobi Decl. ¶ 5.)

[3] Rachele stated that this "is by no means an exhaustive list of the incidents which required the police to respond to the hotel during the 2007-2010 timeframe." (Defs.' Ex. C, Rachele Aff. ¶ 24.)

- On December 9, 2007, Hotel staff requested extra police attention "because of a large crowd." On the same day, a manager at the Hotel called the WLPD about a large, out-of-control crowd in the parking lot. Police were dispatched at approximately 3:00 a.m. "Upon arrival police observed complete chaos taking place in the parking lot, with approximately 100 people outside, some running and screaming through the parking lot. Initially the police were unable to enter the lot due to a large crowd of people and grid lock of vehicles attempting to exit the establishment. There were multiple fights involving numerous individuals." (*Id.* ¶ 9.)

- On December 23, 2007, two Enfield police officers, who were on "private duty assignment" at the Hotel, radioed the WLPD concerning a fight in the Hotel lobby. (*Id.* ¶ 10.)

- On December 30, 2007, several fights broke out among the approximately 50 people in line for Club 91 in the Hotel lobby. One person was arrested for assault. Later that night, the police "received reports of numerous fights occurring" inside Club 91, including one person who pulled "a 4x4x36 inch metal cigarette disposal post out of its base," swung it around, and "eventually threw it into the crowd despite an order from the police to put it down." Because of these issues, the Hotel closed the club and told the patrons to leave. [4] (*Id.* ¶ 11.)

- On January 1, 2008, "a call for police was made from the front lobby vestibule where it was reported that two females were arguing and that one female had assaulted another." (Pls.' Ex. C, Narrative Police Report 08-32, ECF No. 91 at 16.)

- On November 1, 2008, a female, later identified as a security officer at the Hotel, called the WLPD to report that there was going to be a "possible shooting." The caller reported that there were over 20 people claiming to have weapons. Upon arrival, the police heard gunshots. (Rachele Aff. ¶ 16; Pls.' Ex. K, WLPD Narrative Report of Sgt. Michael Balfore at 68-69.)

- On May 23, 2010, the WLPD "received a complaint from an individual who reported that she was assaulted with a shoe in the hotel lounge at around 3:00 a.m." (Rachele Aff. ¶ 18.)

---

[4] In responding to Defendants' statement that "on at least one occasion the hotel management itself shut down an event at the hotel's club due to the outbreak of a violent situation at the event," (Defs.' ¶ SMF 20), Plaintiffs admitted that "at an early point in time, when the security personnel staff at Club 91 was first getting its experience in handling large crowds, the Bar Permittee closed one of these events earlier than usual when a dispute between bar patrons turned unruly." (Pls.' ¶ SMF 20.)

- On June 5, 2010, two females fought in front of the Hotel. In addition, a Hotel employee called 911 and reported that he had been assaulted. Finally, a "manager advised that a guest reported to him that someone had broken a glass door on the west side of the building—the glass was shattered and it appeared that a rock was thrown through the window." (Rachele Aff. ¶ 20.)

- On August 13, 2010, "there were several 911 calls reporting shots fired at the hotel." Police officers heard gunfire when they arrived, and they saw multiple active fights between groups of people in the parking lot. "A male who was shot was transported to St. Francis Hospital." (*Id.* ¶ 21.)

### C. The Hotel's Allegations of Racial Animus

According to Jacobi, about 20-25% of the Hotel's revenue came from the events it hosted, such as dances and concerts. (Plaintiff's Disputed Issues of Material Fact, ECF No. 89 ("Pls.' Stmt. Disputed Facts") ¶ 5; Jacobi Decl., ECF No. 89-5 ¶ 9.) "Many of these events featured entertainers and artists such as 'DJ Styles', a popular disc jockey, who are African-American or Hispanic, and appealed to a clientele whose racial composition was mostly young African-American and Hispanic persons." (Pls.' Stmt. Disputed Facts ¶ 5; Jacobi Decl. ¶ 9.) The Hotel marketed these events through radio advertisements and flyers. (*Id.*) During a meeting before one such event, the June 4, 2010 Ludacris concert, Suchocki allegedly told hotel staff, including Jacobi and Feigenbaum, "I don't like having other colors in this Town" (Jacobi Decl. ¶ 10), or "I don't want other colors in this town." (Feigenbaum Tr. pp. 110, 126-27.)

Plaintiffs assert that Defendants "regularly and systematically interrupted these events and prevented potential customers from attending by, among other things, arbitrarily closing the private road leading to the Hotel, placing police cars with emergency lights at the entrances to the premises[,] . . . falsely informing patrons that the events were sold out and/or that the parking lot was full, and issuing [the Hotel] false and fabricated summonses for excessive noise. . . ." (Jacobi Decl. ¶ 11.) Without describing any specific incidents or citing any specific evidence,

7

Plaintiffs allege that Defendants closed the parking lot on multiple occasions for no reason other than to disrupt events at the Hotel. (Pls.' SMF ¶ 21 (citing Jacobi Decl. ¶¶7-8).) Defendants contend that the police closed the Hotel's parking lot when "the police needed to address criminal incidents, or when there was over occupancy of the parking [lot] which impeded the safe ingress/egress of emergency vehicles." (Defs.' SMF ¶ 21 (citing ¶ Rachele Aff. 26).) Plaintiffs state that, while there may have been some occasions where the shared roadway was obstructed, impeding the access of emergency vehicles, "such obstruction was not caused by over-occupancy of a huge lot, as long as incoming cars would be directed to go far in the back. Any claimed obstruction could easily have been remedied by having the owners remove any illegally parked vehicles." (Pls.' SMF ¶ 21 (citing Jacobi Decl. ¶¶ 7-8).) The parties agree, however, that there is no evidence that any such dances and concerts did not go forward because of anything the police did. (Defs.' SMF ¶ 20; Pls.' SMF ¶ 20.)

### D.  November 8, 2008 Undercover Investigation of Swingers' Event

On September 16, 2008, a person calling himself Mark Lindquist[5] e-mailed the Liquor Control Division within the State of Connecticut Department of Consumer Protection ("Liquor Control") and reported that he had evidence of nudity and sexual acts occurring in public areas of the Hotel, which were visible from a café across the street from the Hotel. (Defs.' Ex. D1, ECF No. 84-3 at 35; Defs.' SMF ¶ 9.) Lindquist also informed Liquor Control that several websites were advertising swingers' parties at the Hotel. (Defs.' Ex. D1, ECF No. 84-3 at 35.)

---

[5] References to this person in the parties' exhibits occasionally spell his last name in other ways, such as "Linquist." (*See* Pls.' Ex. I, ECF No. 91 at 32.) It would later emerge that the person who had contacted Liquor Control was not Mark Lindquist, but John Moylan, an operator of a competing swingers' group called New England Swingers. (Pls.' SMF ¶ 9.)

Liquor Control agents visited the Hotel and spoke with Jacobi and Feigenbaum about Lindquist's reports on September 23, 2008. (Defs.' Ex. D1, ECF No. 84-3 at 35.) According to a report by Philip Colla, Special Agent for Liquor Control, "Jacobi stated that he was willing to comply with the liquor laws and that the advertised conduct does not happen within his hotel." (*Id.* 35.) The Liquor Control agents gave Jacobi a current Liquor Control Act and Regulation book, and showed him the sections stating that persons may not be unclothed and that no one is allowed to perform or simulate sexual acts on the permit premises, except in private sleeping accommodations. (*Id.*) Colla reported that they "discussed at length what acceptable conduct is and what is not allowed under the liquor control law." (*Id.*)

Liquor Control Agents Colla and Lewis met with Lindquist in person at a Dunkin Donuts in Wethersfield, Connecticut, on October 10, 2008. (*Id.* at 35-36.) Lindquist did not provide the agents with any identification, but he claimed that he was a father who frequented the café across the street from the Hotel with his children (Defs.' SMF ¶ 9), and that he could see unclothed people from the café. (Defs.' Ex. D1, ECF No. 84-3 at 35-36.) He also claimed that he attended a swingers' party at the Hotel in June 2008 to take photographs to send to Liquor Control, and he had witnessed oral sex acts in the barroom. (*Id.* at 36.) At the next scheduled swingers' party, on October 25, 2008, the WLPD "found a party in operation [at the Hotel] but observed no unclothed individuals and no sexual acts." (*Id.*) Agent Colla notified Lindquist that the police did not find any sexual activity. (*Id.*) Lindquist responded by e-mail and said that he had attended the party and took "photographs of unclothed patrons and sexual acts displayed in the public areas." (*Id.*) Agent Colla forwarded the photographs provided by Lindquist to the WLPD. (*Id.*)

Colla and Lewis met with Rachele and WLPD Detective Dawn Morini on November 5, 2008, "to discuss an undercover operation at the hotel to substantiate the claims of sexual acts

9

being performed on the permit premises." (*Id.*) In preparation for the operation, Agent Colla signed up online for a party at the Hotel on November 8, 2008, which was organized by a group known as "Hot Couples" or "HCP." (*Id.*) Lewis and Colla arrived at the Hotel at 10:05 p.m., and entered Club 91 through a door with a sign that stated "HCP Private Party, must be on guest list, HCP Private Party." (*Id.*) The agents were greeted by the promoter of the party, Maulucci, who confirmed that they were on the guest list. (*Id.*; Pls.' Ex. I, ECF No. 91 at 31.) The agents ordered drinks, and when the agents asked their bartender if there was food being served, she said "no, sorry." (Defs.' Ex. D1, ECF No. 84-3 at 37.) The agents stood to the left end of the bar, where they "had a clear view into a sitting area" despite the presence of plants, the purpose of which appeared to be to block the view. (*Id.* at 37 ("we had a clear view into a sitting area that they attempted to obstruct viewing with plants.").) The Agents observed men and women exposing their genitals, fondling others' genitals, engaging in oral sex, and masturbating. They also observed women exposing their breasts and men fondling and caressing exposed breasts. (*Id.*) The agents observed a photographer taking photographs of attendees who were unclothed, and who were simulating and performing sex acts. (*Id.*) They saw Brian True, the permittee, moving through the room and noted that he did not attempt to stop such sex acts. (*Id.* at 38.) Colla then called Detective Morini of the WLPD and informed her that the agents had observed "violations." (*Id.*) The agents then left and reentered Club 91 wearing raid jackets and began an inspection of the premises. Agent Lewis interviewed Maulucci, and learned that he pays $500 per event for use of Club 91. (*Id.* at 40.) Plaintiffs' exhibits contain copies of contracts between the Hotel and Maulucci, which show that, for each party, HCP paid the Hotel $500 to rent Club 91 for the night, and the Hotel also received proceeds from liquor sales and room reservations. (Pls.' Ex. O, ECF No. 91-1.)

At the end of the inspection, Agent Colla "took the photographs received from the complainant, Mark Lindquist, and tried to identify the areas in the hotel where the photos were taken," during a party in June 2008. (Defs.' Ex. D1, ECF No. 84-3 at 40.) Two of the photos, allegedly from June 2008, depicted couples engaged in graphic sexual conduct on green couches, which Colla found were located in the lobby of the Hotel. (*Id.*) Other photos provided by Lindquist and allegedly from the October 25, 2008 party included a photo of a woman "exposing her buttocks and genitals" in front of a wall that had a painting of flowers, and Colla found this wall in the dining room adjacent to the lobby. (*Id.*) Photographs seized from the photographer on November 8 showed additional photos taken at the party on October 25, 2008, and at the party on November 8, 2008. (*Id.* at 40-41.)

The agents found multiple violations of the Connecticut Liquor Control statutes and regulations for June 2008, October 25, 2008, and November 8, 2008, including violations of: Conn. Gen. Stat. § 30-62a (consumer bars); Conn. Gen. Stat.§ 30-21(d) (definition of Hotel, which requires food to be served at all times when alcoholic liquor is served); Regs. Conn. State Agencies § 30-6-A24(c) (conduct of premises); and Regs. Conn. State Agencies § 30-6-A24(a) (unlawful conduct: smoking). (*Id.* at 39, 41-42.)

Based on this investigation, and relying on the Liquor Control agents' observations, interviews, and communications with Lindquist, Rachele submitted an affidavit as part of his application for an arrest warrant for Jacobi. (Defs.' SMF ¶ 11; Pls.' Ex. I, ECF No. 91 at 31.) A Connecticut Superior Court Judge determined that there was probable cause to arrest Jacobi. (Defs.' SMF ¶ 11.) Rachele's affidavit also stated that, on November 8, 2008, he and the Liquor Control agents interviewed Maulucci, who told them that "he had entered into a contract with Sharok Jacobi to have his parties at the hotel and that Jacobi was fully aware of the parties and

what was taking place in Club 91 and the lobby of the hotel." (Pls.' Ex. I, (ECF No. 91 at 32) Arrest Warrant Affidavit for Jacobi, p. 38.)

An arrest warrant was issued for Jacobi on November 13, 2008, charging him with Criminal Liability to Commit Obscenity in violation of Connecticut General Statutes §§ 53a-9[6] and 53a-194[7] and Criminal Liability to Commit Public Indecency in violation of Connecticut General Statutes §§ 53a-9 and 53a-186[8] for events "which took place on or about the date of 11-8-08."[9] (Defs.' Ex. D1, ECF No. 84-3 at 41; Pls.' Ex. I, ECF No. 91 at 33.) Jacobi turned himself in to the WLPD on November 17, 2008. (Pls.' Ex. I, ECF No. 91 at 48.) Plaintiffs contend that the assertions in Rachele's affidavit for Jacobi's arrest warrant were "not true nor accurate," there was no probable cause, and Rachele's affidavit "failed to disclose that the evidence presented was illegally obtained" as a result of Rachele's previous warrantless searches. (Pls.' SMF ¶ 11.) Jacobi asserts that Rachele failed to tell the signing judge that:

---

[6] Conn. Gen. Stat. § 53a-9 provides, in relevant part that, "[i]n any prosecution for an offense in which the criminal liability of the defendant is based upon the conduct of another person under section 53a-8 it shall not be a defense that: (1) Such other person is not guilty of the offense in question because of lack of criminal responsibility or legal capacity or awareness of the criminal nature of the conduct in question or of the defendant's criminal purpose or because of other factors precluding the mental state required for the commission of the offense in question. . . ."

Conn. Gen. Stat.§ 53a-8(a) provides that "[a] person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[7] Conn. Gen. Stat. § 53a-194(a) provides that "[a] person is guilty of obscenity when, knowing its content and character, he promotes, or possesses with intent to promote, any obscene material or performance."

[8] Conn. Gen. Stat. § 53a-186(a) provides that "[a] person is guilty of public indecency when he performs any of the following acts in a public place: (1) An act of sexual intercourse as defined in subdivision (2) of section 53a-65; or (2) a lewd exposure of the body with intent to arouse or to satisfy the sexual desire of the person; or (3) a lewd fondling or caress of the body of another person. For the purposes of this section, 'public place' means any place where the conduct may reasonably be expected to be viewed by others."

[9] Permittee True was arrested for the same offenses. (*See* Defs.' Ex. D1, ECF No. 84-3 at 41.)

i.   informant Lindquist was never asked for identification when he gave the Liquor Control officers "phony, cut and pasted pictures" purporting to show sexual acts taking place in public areas of the Hotel on October 25, 2008;

ii.   "no reasonable . . . police officer would believe that such activity would have taken place . . . at a luxury hotel, in public areas," because it would hurt its business, especially in light of the fact that, during the event actually observed by undercover authorities on November 8, 2008, "no such activity [occurred] outside a tightly sealed off bar area";

iii.   "Moylan" was never questioned by Rachele "about his obsessive interest in stopping HCP events at Club 91";

iv.   the Hotel "was not a sleazy motel where unsavory sex and prostitution occur but a gorgeous hotel renovated at a cost of millions of dollars"; and

v.   the true identity of informant Lindquist was John Moylan, an operator of a competing swingers' group, who had a criminal record.

(Pls.' Stmt. Disputed Facts ¶ 43.)

Plaintiffs assert that "there were never any unclothed patrons and sexual acts displayed in public areas" of the Hotel, and "any purported pictures of such activity at a Swingers' party held in October 2008 were fraudulently manufactured by" Moylan. (Pls.' SMF ¶ 9.)

On November 22, 2008, Colla received an anonymous e-mail from "Whistle Blower," which stated that Lindquist was actually John Moylan, who was using the Liquor Commission to disrupt rival swinger parties. (Defs.' Ex. D1, ECF No. 84-3 at 41.) The Whistle Blower attached a picture of Moylan, which Colla confirmed was the man he had met at Dunkin Donuts. (*Id.*)

After the raid, Club 91 was closed for several months (Defs.' Ex. E, Rachele Tr. at 140), and later reopened as a sports bar renamed "Windsor Lounge." (Pls.' Stmt. Disputed Facts ¶ 30.) Plaintiffs state that Defendants were responsible for "forcing the closure of Club 91 for about ten months through threatened arrests and directives" of Rachele. (Pls.' SMF ¶ 31-32 (citing Jacobi Decl. ¶ 34).) Plaintiffs, however, do not cite any specific evidence in support of this assertion.

Defendants assert that Liquor Control was responsible for closing Club 91. (Defs.' SMF ¶ 12 (citing Rachele Tr. pp. 139-40).) Plaintiffs did provide evidence, however, that Liquor Control suspended the Hotel's liquor license from September 15 to October 29, 2009, because of the violations of June, October, and November 2008. (Pls.' Ex. W, pp. 167-68.) Plaintiff's exhibits suggest that the Hotel accepted an "offer of compromise" with the Connecticut Department of Consumer Protection to resolve the Liquor Control violations "in lieu of a formal administrative hearing." (Pls.' Ex. W, pp. 169-70.)

### E.  Ludacris Event of June 4, 2010

On June 4, 2010, the rapper Ludacris[10] performed at an event at the Hotel. Defendants allege that, during the previous week, the fire marshal had advised the permittee, Harold Thompson, that the Hotel's liquor permit had expired. (Defs.' SMF ¶ 13.) Shortly before 5pm on June 4, 2010, Rachele notified the Hotel that its liquor permit had expired. Plaintiffs allege that the Hotel had recently changed its permittee to Thompson and, although it had received approval for this change from Liquor Control, it still needed a seal from the Town to renew its permit, which it had not received or obtained as of June 4, 2010. (Pls.' SMF ¶ 14.) According to Jacobi, it "is common practice at the State Liquor Division [that] no violations for the technical lack of a permit with the new Permittee are issued in the interim, and [Hotel] personnel had been advised to leave the prior license with the old Permittee hanging until replaced by the new one." (Pls.' Stmt. Disputed Facts ¶ 12.) Jacobi's declaration does not indicate how he would have personal knowledge of practices of the Liquor Control Division of the Department of Consumer protection, or otherwise cite any evidence to support these statements. Plaintiffs also allege that Rachele "prevented the bar employees from selling liquor that night under threats of criminal

---

[10] Ludacris is a famous rapper, entrepreneur, and actor. *See* Wikipedia, *Ludacris,* https://en.wikipedia.org/wiki/Ludacris (last visited September 28, 2015.)

arrest." (Pls.' SMF ¶ 13.) Finally, Plaintiffs allege that the timing of Rachele's notification that the Hotel's liquor license had expired—just before the Town's offices closed for the day at 5 p.m. and prior to the Ludacris event that night—"was calculated to unlawfully prevent [the Hotel] from obtaining a proper liquor license on time and from serving alcoholic beverages at a scheduled major event . . . ." (Pls.' Stmt. Disputed Facts ¶ 16.)

Because the Hotel could not sell alcohol, "there was a commensurate decrease in the need for extra security for the event." (Jacobi Decl. ¶ 20.) Therefore, the Hotel canceled the hired services of ten police officers who had been scheduled to work at the event. (*Id.*) Jacobi alleges that Rachele threatened to arrest manager Patrick McNeil and permittee Thompson if they did not pay him $3,500 immediately for the cancellation of the police officers. (*Id.*) According to Rachele's affidavit "[b]ased on non-payment of police officers hired by the hotel for events that occurred a couple months previously in April of 2010, hotel personnel were advised that any payment for officers assigned to work at the hotel had to be made prior to the function." (Defs.' Ex. C, ECF No. 84-3 at 28, Rachele Aff. ¶ 19.)

Finally, according to Jacobi, Defendants prevented potential customers from attending the concert that night "by, among other things, arbitrarily closing the private road leading to the Hotel, placing police cars with emergency lights at the entrances to the premises and falsely informing patrons that the events were sold out and/or that the parking lot was full." (Jacobi Decl. ¶ 21.) As a result of Defendants' interference, attendance was lower than it would have been, depriving the Hotel of revenues. (*Id.* ¶ 22.)

### F.  Fire Code Violations of August 21, 2010

The parties agree that, on the evening of August 21, 2010, there were no parking spots left on the Hotel property and "people parked up against the building in fire lanes all around the

hotel." (Defs.' SMF ¶ 14; Pls.' SMF ¶ 14.) The parties also agree that the Hotel had been notified prior to August 21 that there were several outstanding fire code violations, including missing fire doors on the second floor. (Defs.' SMF ¶ 14; Pls.' SMF ¶¶ 14, 17.) As of August 21, those violations had not been remedied. The Hotel asserts, without citing any admissible evidence, that Rachele "purportedly discovered" these violations "on one of his warrantless searches," but that the Fire Marshal had given the Hotel "plenty of time to correct them," (Pls.' SMF ¶ 14) and that "the missing fire doors were on order from a special manufacturer in Queens, New York and the Fire Marshal[] was made aware of this."[11] (Pls.' SMF ¶ 17.)

According to Deputy Fire Marshal John Kupernik's Fire Investigation Report, another deputy fire marshal notified Kupernik that the Hotel parking lot was full, that "the Fire Lanes were blocked by vehicles[,] and that the fire apparatus would not be able to access the Hotel." (Defs.' Ex. F1, Fire Investigation Report, ECF No. 84-3 at 52.) At 8:30pm, Kupernik notified the WLPD that he and another deputy fire marshal were going to the Hotel to check the fire lanes. (*Id.*) Once at the hotel, Kupernik "noted that the Fire Lanes were blocked and access was limited to one vehicle only." (*Id.*) Upon questioning the manager inside the Hotel, Kupernik learned that there were about 700 to 800 people present, but the Hotel did not have an exact count. (*Id.*) Because four fire doors in wings A and B on the second floor were missing, the rooms in wings A and B on that floor were not supposed to be occupied. (*Id.*) But Kupernik noted that the fire doors were still missing, and that rooms in that area were occupied, so he called the Fire Marshal and explained the situation, and "[a] decision was made . . . to move the people from the second floor to the first within 30min." (*Id.*) The deputy fire marshals checked building exits, and found

---

[11] Although Plaintiffs cite paragraphs 46 and 47 of the Jacobi Declaration, paragraph 47 includes the following language, which suggests that Jacobi lacks personal knowledge concerning the fire doors: "I was a hands off manager who infrequently visited the [Hotel] and was not aware of the fire-door problem." (Jacobi Decl. ¶ 47.)

exit doors that would not open or were hard to open. (*Id.*) Kupernik again contacted the Fire Marshal to notify him of this information. (*Id.*) The fire marshals also observed that the lobby of the Hotel was filled with smoke, and the fire alarm system was activated and silenced. (*Id.*) This meant that, if there was a fire, the fire alarm would not sound. Kupernik asked Hotel staff why the alarm was silenced, and the "management said that this always happens when we turn on the AC in the Ballrooms and Lounge." (*Id.*) Kupernik again called the Fire Marshal to notify him of *this* information, and at around 9:30pm, "a decision was made to close the building down and remove all occupants from the building" under Conn. Gen. Stat. § 29-306c.[12] (*Id.*) Kupernik reported that he notified the State Fire Marshal's Office ("SFMO"), and the SFMO sent State Trooper John Sawyer to assist. (*Id.*) Kupernik told the Hotel manager that "the building will remain closed until all cited Fire Code violations were corrected." (*Id.*) On Wednesday, and again on Friday of the following week, Kupernik inspected the doors and alarm systems and found them still not in compliance. (*Id.* at 53.) By August 30, 2010, the systems "were found in compliance and the Hotel and Lounge could reopen for business." (*Id.*)

Plaintiffs deny that anyone silenced the alarm, and claim that "a person sent by management to check the alarms that night was denied access by the police." (Pls.' SMF ¶ 14 (citing Jacobi Decl. ¶ 47).) Kupernik's affidavit states that the Windsor Locks Fire Marshal's office "independently made the determination to shut down the hotel due to serious fire code violations which presented a danger to human life and safety." (Defs.' SMF ¶ 15 (citing Kupernik Aff. ¶ 4).) Kupernik also states that any coordination with the WLPD with respect "to

---

[12] Conn. Gen. Stat. § 29-306(c) provides, in relevant part, that "[i]f the local fire marshal or a local police officer determines that there exists in a building a risk of death or injury from (1) blocked, insufficient or impeded egress, [or] (2) failure to maintain or the shutting off of any fire protection or fire warning system required by the Fire Safety Code or State Fire Prevention Code . . . such fire marshal or police officer may issue a verbal or written order to immediately vacate the building."

addressing safety concerns and code violations" at the Hotel "was the type of cooperation and assistance among law enforcement agencies that is typical and appropriate under the circumstances." (Defs.' SMF ¶ 15 (citing Kupernik Aff. ¶ 5).) Citing no specific paragraph of Jacobi's declaration, Plaintiffs deny these statements, and allege that Rachele called the Fire Marshal and pressured him to close the Hotel on August 21, 2010. (Pls.' SMF ¶ 15 (citing Jacobi Decl.).)

### G. Trade Shows[13]

According to Feigenbaum, the Hotel "arranged with organizers and planners of doll shows, toy shows, card shows, antique and collectible shows, gun shows, and other trade shows and exhibitions, to hold events at the [Hotel] in exchange for a fee. These events were to be advertised to the public and open to the public. Goods and merchandise were to be made available by participating vendors chosen by the organizers and planners for sale to the attending public." (Pls.' Stmt. Disputed Facts ¶ 38 (citing Feigenbaum Tr. at 85-95).)

The parties agree that, for the trade shows/exhibitions that occurred at the Hotel between 2007 and 2010, only vendors who sold firearms were required to undergo fingerprinting. (Defs.' SMF ¶ 19; Pls.' SMF ¶ 19.) The parties also agree that "Rachele is not aware of any other hotels within the Town" that hosted such trade shows/exhibitions. (*Id.*) Defendants allege, however, that a Town ordinance required "any vendor who did not have a business within the Town . . . to fill out an application to sell and pay a $50.00 fee." (Defs.' SMF ¶ 19.) Plaintiffs dispute this, and allege that Rachele improperly required that every vendor obtain a permit and pay the fee based on this ordinance, when the ordinance, "on its face clearly applies only to sales conducted by out-of-town residents in private residences or in cars." (Pls.' SMF ¶ 19.)

---

[13] The allegations about trade shows are not tied to any specific alleged constitutional violations, but seem to be included by the Plaintiffs to show that the Defendants were generally harassing the Plaintiffs.

## II.      **STANDARD**

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks and citation omitted). In reviewing the record, the court must "construe the facts in the light most favorable to the non-moving party," *Breyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008), and "resolve all ambiguities and draw all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). The ultimate test "is whether the evidence can reasonably support a verdict in Plaintiff's favor." *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 157 (2d Cir.2000).

Rule 56(c)(1)(A) of the Federal Rules of Civil Procedure states that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: citing to particular parts of materials in the record . . . ." Moreover, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

> [A] party may not rely on his pleadings to avoid judgment against him[,] and . . . [t]here is no burden upon the district court to distill every potential argument that

> could be made based upon the materials before it on summary judgment. Rather,
> the onus is upon the parties to formulate arguments; grounds alleged in the
> complaint but not relied upon in summary judgment are deemed abandoned.

*Willoughby v. Peterson*, No. 3:10 CV 509 JGM, 2012 WL 3726532, at *8 (D. Conn. Aug. 27,

2012) (internal citations and quotation marks omitted).

The Local Rules of Civil Procedure for the District of Connecticut specify requirements

for the parties' Local Rule 56(a) statements, which they must use to support and oppose a motion

for summary judgment. "Each statement of material fact . . . and each denial in an opponent's . . .

Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to

testify as to the facts at trial and/or (2) evidence that would be admissible at trial. . . . The

'specific citation' obligation of this Local Rule requires counsel . . . to cite to specific paragraphs

when citing affidavits . . . and to cite to specific pages when citing to deposition or other

transcripts or to documents longer than a single page in length." CT R USDCT L.Civ.R.

56(a)(3). The rule further states that "failure to provide specific citations to evidence in the

record as required by this Local Rule may result in the Court deeming certain facts that are

supported by the evidence admitted in accordance with Rule 56(a)1 or in the Court imposing

sanctions, including, when the movant fails to comply, an order denying the motion for summary

judgment, and, when the opponent fails to comply, an order granting the motion if the undisputed

facts show that the movant is entitled to judgment as a matter of law." *Id.*

## III.   DISCUSSION

### A.   Count One – First Amendment

In Count One, the Hotel brings a claim under 42 U.S.C. § 1983 against all Defendants for

violation of the Hotel's rights to free expression and association under the First Amendment.

(Am. Compl. ¶¶ 60-61.) The Hotel claims that the Defendants harassed, intimidated, arrested,

and threatened to arrest patrons, potential customers, and contractors of the Hotel, which caused the Hotel to lose revenue. (*Id.* ¶¶ 62-64.)

### 1. Free Speech

"To prevail on a First Amendment claim asserted under 42 U.S.C. § 1983, a plaintiff must prove by a preponderance of the evidence that (1) the expression at issue was constitutionally protected, (2) the alleged retaliatory action adversely affected his constitutionally protected expression, and (3) a causal relationship existed between the constitutionally protected expression and the retaliatory action." *Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003).

### a. *Swingers' Events*

Although the Hotel itself did not promote or advertise the swingers' events, but, rather, rented space to a group that did so, the Hotel has standing to challenge Defendants' actions under the First Amendment. "In order to meet the minimum constitutional requirements for standing, a plaintiff must allege an actual or threatened injury to himself that is fairly traceable to the allegedly unlawful conduct of the defendant and is likely to be redressed by the requested relief." *Sullivan v. Syracuse Hous. Auth.*, 962 F.2d 1101, 1106 (2d Cir. 1992) (internal quotation marks and citations omitted). The Hotel has alleged an actual injury—the financial injury from lost revenue as a result of Defendants' alleged actions. The Hotel has also alleged that its injury is fairly traceable to Defendants' conduct. For example, the Defendants' alleged closure of Club 91, which accounted for 20-25% of the Hotels' revenue, directly resulted in lost revenue for the Hotel. (Am. Compl. ¶ 66.) Finally, the Hotel alleges that the injury could be remedied with damages of at least $10,000,000 to compensate it for lost revenue. (*Id.* ¶ 67.) Thus, the Hotel meets the minimum requirements of standing to raise the First Amendment claim. And although the Hotel is asserting speech rights of its customers, it may do so without exceeding the limits on

"prudential standing." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955, 958 (1984) ("In addition to the limitations on standing imposed by Art. III's case-or-controversy requirement, there are prudential considerations that limit the challenges courts are willing to hear"; holding that there was prudential standing because "[t]he activity sought to be protected is at the heart of the business relationship between [plaintiff] and its clients, and [plaintiff's] interests in challenging the statute are completely consistent with the First Amendment interests of the charities it represents"); *Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1252 (5th Cir. 1995) ("a business . . . may properly assert its . . . customers' First Amendment rights where the violation of those rights adversely affects the financial interests or patronage of the business.").

The free speech claim fails, however, on the merits. The sexual activity the Liquor Control agents described observing in the Hotel bar on November 8, 2008—including oral sex, masturbation, and the exposing of and fondling of genitals—is not constitutionally protected speech. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) ("Being 'in a state of nudity' is not an inherently expressive condition."); *Threesome Entm't v. Strittmather*, 4 F. Supp. 2d 710, 721 (N.D. Ohio 1998) ("it is clear that the First Amendment does not protect any such kernel contained in the activities of sexual intercourse or fondling of genitals"); *832 Corp. v. Gloucester Twp.*, 404 F. Supp. 2d 614, 626 (D.N.J. 2005) ("Having sex, without more, is not expressive conduct protected by the First Amendment."). The HCP swingers' event involved no stage or performance aspect (with the exception of the fact that someone was taking photographs), and it was not accompanied by any advocacy of a particular lifestyle. Thus, it is not protected by the First Amendment for the same reasons that prostitution is not so protected. *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705 ("the sexual activity carried on in this case [which included prostitution, masturbation, fondling, and fellatio by patrons on the premises of the store]

manifests absolutely no element of protected expression."); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 217 (1990) (citing "sexual encounter centers" as an example of a business that is not protected by the First Amendment). Further, nothing about the Liquor Control investigation—which was driven by the location of the activity, e.g., the fact that it was taking place on liquor-permitted premises—prevents or punishes any expressive advocacy of the "swingers' lifestyle," which still may flourish on websites and through other advertising.

### b.    *Concerts*

"[L]ive entertainment, such as musical and dramatic works fall within the First Amendment guarantee." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65. Thus, the concerts are protected activity, and can be fairly attributed to the Hotel, as the Hotel associated itself with the events. (*See* Jacobi Decl., ECF No 89-5 ¶ 9 (events were hosted by the Hotel and were marketed "by way of advertisements on radio and by distribution of flyers").) In any event, the Hotel has constitutional standing to challenge Defendants' actions directed against its customers for the same reasons stated above. Further, because of the Hotel's advertising of the events, it would be consistent with the doctrine of prudential standing to allow the Hotel to assert this claim on behalf of the concert goers. *See Joseph H. Munson Co.*, 467 U.S. at 958 (recognizing prudential standing where claimants' "interests in challenging the statute are completely consistent with the First Amendment interests of the charities it represents").

But the Hotel has failed to raise a genuine issue of fact as to whether the *Defendants* infringed these speech rights of the concert goers. First, the evidence in the record suggests that it was the Liquor Control Division and the Fire Marshal—not the Defendants—that closed down the bar and hotel at various times, thereby reducing the Hotel's revenues. (*See, e.g.* Defs.' Ex. F, Kupernik Aff. ¶ 4 ("the Windsor Locks Fire Marshal's office independently made the

determination to shut down the hotel due to serious fire code violations which presented a danger to human life and safety"); Pls.' Ex. W, pp. 167-68 (showing that Liquor Control suspended the Hotel's liquor license from September 15 to October 29, 2009, because of the violations of June, October, and November 2008).) There is no admissible evidence that Rachele "pressured" Liquor Control or the Fire Marshal or improperly influenced them to interfere with or shut down the Hotel's operations. While Mr. Jacobi asserts at various times in his declaration that such "pressuring" by Rachele of other law enforcement agencies took place (*see* Jacobi Decl. ¶ 41), these statements are vague and the declaration provides no facts suggesting that he has personal knowledge of communications between Rachele and the Fire Marshal or Liquor Control agents. Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

Similarly, while there are vague allegations that the WLPD falsely told concert goers that the parking lot was full or that they could not enter, there is, again, no affidavit or deposition testimony from a witness having personal knowledge of such alleged falsehoods. Instead, such allegations appear to be second-hand and thus hearsay, and do not appear to be made on person knowledge. (*See* Jacobi Decl. ¶¶ 21, 11 ("[Rachele] and other police officers acting under his direction regularly and systematically interrupted these events and prevented potential customers from attending by, among other things, arbitrarily closing the private road leading to the Hotel, placing police cars with emergency lights at the entrances to the premises and falsely informing patrons that the events were sold out and/or that the parking lot was full, and issuing false and fabricated summonses for excessive noise"); *see* Fed. R. Civ. P. 56(c)(4).) Third, all of the concerts or events at issue proceeded—with the exception of the August 21, 2010 event,

described above, which was shut down by the fire marshal—suggesting there was no infringement of the speech activities of the performers or concert goers, although the Hotel may have derived less revenue than it would have otherwise.[14]

### 2.    Freedom of Association

The U.S. Supreme Court has recognized two types of constitutionally protected association under the First Amendment: intimate and expressive. Intimate association is the right "to enter into and maintain certain intimate human relationships . . . ."*Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984). "At a minimum, it extends to relationships that attend the creation and sustenance of a family—marriage, childbirth, the raising and education of children, and cohabitation with one's relatives." *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 996 (2d Cir. 1997) (internal quotation marks and citations omitted). Expressive association is the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts,* 468 U.S. at 618. "The Constitution does not recognize a generalized right of social association." *Sanitation & Recycling Indus., Inc.*, 107 F.3d at 996. "The right generally will not apply, for example, to business relationships, chance encounters in dance halls, or paid rendezvous with escorts." *Id.* (internal citations omitted).

---

[14] It is not clear that the event on August 21, 2010, was actually a concert; Jacobi described it as a "large event." (Jacobi Decl. ¶ 41.) There appear to have been other events that were canceled or shut down, but the Plaintiffs either are not making claims about such events or they have not provided enough specific evidence in response to Defendants' evidence to enable the Court to determine whether such events amounted to constitutionally protected activity. For example, manager Jennifer Feigenbaum testified that she remembered three events being "canceled": the swingers' event, a 50 Cent concert, and a New Year's Eve Party in 2007 or 2008. (Feigenbaum Tr. at 42-43, 45.) But Feigenbaum could not recall specifically why the 50 Cent concert was canceled. (*Id.* at 44-45.) Feigenbaum recalled that the police told the Hotel to cancel the New Year's party because too many people were expected to be there. (*Id.* at 46.) Except for the swingers' party, Permittee Brian True could not remember an event being shut down. (True Tr. at 177 ("A. . . . I don't think I ever shut down a show. . . . I don't remember it.").)

### a.  Swingers' Events

The Hotel had a business relationship with the swingers' group, "Hot Couples" or "HCP," as shown by the contracts between the Hotel and Maulucci, HCP's promoter. (Pls.' Ex. O, ECF No. 91-1 at 45-56.) These contracts show that the Hotel rented Club 91 to the group for $500 per night and received proceeds from liquor sales and room reservations. (Pls.' Ex. O, ECF No. 91-1 at 46.) Thus, the Hotel does not have a constitutionally protected right of association in the swingers' events. Even the swingers themselves could assert no violation of constitutionally protected associational rights here. *See FW/PBS, Inc*, 493 U.S. at 237 ("Any personal bonds that are formed from the use of a motel room for fewer than 10 hours are not those that have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs."); *Wigginess Inc. v. Fruchtman*, 482 F. Supp. 681, 689-90 (S.D.N.Y. 1979) ("It is also clear that freedom of association does not apply to the activities in question here [in leisure spas, swingers clubs and health clubs]. That constitutional guarantee has been judicially derived by implication from the express guarantees of the first amendment and is therefore limited to activities involving speech, press, petition and assembly.").

### b.  Concerts

The Hotel's claim that Defendants violated its associational rights by allegedly interfering with concerts attended by large numbers of young African Americans fails for similar reasons. The Hotel's relationship with the concert goers and performers was commercial—it hoped to earn revenue from the events. Further, even if the Hotel has prudential standing to assert associational rights of the concert goers and performers, *see Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1252 (5th Cir. 1995), the evidence in the record does not make out a claim of an associational violation against the concert goers and performers either.

Even if the performers and concert goers were engaged in constitutionally protected association, the claim that their rights were infringed fails on the merits, as all of the specific concerts about which the Plaintiffs complain went forward, and there is no admissible evidence that the Defendants interfered with the concert goers to prevent them from attending. *See Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 211-12 (5th Cir. 2009) (finding no constitutional infringement when a "concert proceeded as scheduled, and the amended complaint did not allege that the deputy sheriffs interfered so as to prevent any persons who wanted to attend from attending."). Jacobi alleges that, on June 4, 2010, Rachele threatened to arrest Hotel manager Patrick McNeil and permittee Thompson if they did not pay him $3,500 immediately for the cancellation of police security officers who were no longer necessary because alcohol would not be served. (Jacobi Decl. ¶ 20.) Jacobi also alleges that Defendants prevented potential customers from attending the concert that night "by, among other things, arbitrarily closing the private road leading to the Hotel, placing police cars with emergency lights at the entrances to the premises and falsely informing patrons that the events were sold out and/or that the parking lot was full." (Jacobi Decl. ¶ 21.) Jacobi's declaration, however, does not set out specific facts that would be admissible in evidence, or show that Jacobi had personal knowledge of such conduct. Indeed, Jacobi testified that he "did not operate the hotel day to day" (Jacobi Tr. pp. 167, 186), and that he had no personal knowledge of what happened on the night of June 4, 2010. (Jacobi Tr. pp. 187-192 at 191 ("Q. The bottom line is you had no personal knowledge of what happened because you weren't there. A. No, it was not personal.").) In short, the Hotel has failed to respond to Defendants' evidence with admissible evidence of its own to support this claim.

### B.        Count Two: Equal Protection

In Count Two the Hotel brings a claim under Section 1983 against all Defendants for violation of the Hotel's equal protection rights. (Am. Compl. ¶¶ 68-77.) Specifically, the Hotel claims that Defendants violated its equal protection rights by "deliberately and selectively" treating the Hotel "differently from the other local hotels similarly situated" without a rational basis. (*Id*. ¶ 71.) This claim does not mention the concerts, nor does it make any allegations based on race. Instead, it focuses on the swingers' events. (*Id*. ¶ 72.) The Hotel claims that Defendants "allowed the hosting of identical" events organized by HCP and Maulucci at the Ramada Inn for several years before such events occurred at the Hotel, "and then allow[ed] them to operate at the Clarion Hotel for more than four years after having been banished from" the Hotel. (*Id*.) The Hotel further alleges that Defendants' "selective treatment" of the Hotel "was motivated by animus, malice and bad faith" (*Id*. ¶ 73), and that the Town "has encouraged and permitted such unconstitutional policies and customs to be carried out." (*Id*. ¶ 74.)

The Fourteenth Amendment states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "A plaintiff who does not claim to be a member of a constitutionally protected class may bring an Equal Protection claim on one of two theories: selective enforcement or 'class of one.'" *Missere v. Gross*, 826 F. Supp. 2d 542, 560 (S.D.N.Y. 2011) (*citing Cobb v. Pozzi,* 363 F.3d 89, 109–10 (2d Cir.2004)). To prevail on a claim of selective enforcement, the Hotel must show both (1) that it "was treated differently from other similarly situated businesses, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007) (internal quotation marks

and citations omitted). To prevail on a "class-of-one" claim, the Hotel must show that it "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 58 (2d Cir. 2010).

"Generally, whether two entities are similarly situated is a factual issue that should be submitted to the jury. But this rule is not absolute and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790-91 (2d Cir. 2007) (internal quotation marks and citations omitted). "[C]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Ruston*, 610 F.3d at 59-60. Many district "courts have applied a slightly less stringent similarly situated standard in the selective enforcement context," than in the class-of-one context. *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 696 (S.D.N.Y. 2011). This lower standard requires "plaintiffs to show that plaintiff and comparators were similarly situated in all material respects, or that a prudent person, looking objectively at the incidents, would think them roughly equivalent." *Missere,* 826 F. Supp. 2d at 561 (internal citations and quotation marks omitted).

Under either standard, the Hotel has failed to show that it was treated differently from others similarly situated. First, there is no evidence in the record that Defendants were aware of swingers' events taking place at the Ramada Inn or the Clarion Hotel. Second, the Hotel fails to offer any evidence as to the frequency of such activities, the specific nature of the activities, the number of people involved and, critically, whether liquor-permitted-premises were involved in the swingers' events at the other locations—let alone whether there were any liquor law

violations at the other locations—thereby failing to carry its burden to demonstrate that they were similarly situated.

Although the amended complaint does not mention the concerts in this Count, the Hotel has failed, in any event, to raise a genuine issue of material fact as to any selective enforcement claim with respect to the concerts as well. The Hotel has standing to assert the rights of its customers in this context. *Young Apartments, Inc. v. Town of Jupiter, FL*, 529 F.3d 1027, 1039 (11th Cir. 2008). Moreover, there is evidence in the record of racial animus by Defendant Suchocki, although not by Defendant Rachele. Jennifer Feigenbaum, a manager, testified that WLPD Chief Suchocki stated, while meeting with Feigenbaum and Jacobi in his office, that "I don't want to have any colors in this town."[15] (Feigenbaum Tr. 110-11, 115.) Nevertheless, the Hotel must still prove that it was treated differently from similarly situated others on account of race. *See Anderson v. City of New York*, 817 F. Supp. 2d 77, 94 (E.D.N.Y. 2011) ("if a plaintiff attempts to prove selective enforcement or prosecution based on race, he must demonstrate that similarly situated individuals of a different race were not [subjected to the offensive conduct]." (internal citations and quotation marks omitted)). The Hotel has introduced no evidence of this and the Defendants have introduced contrary evidence that "during the 2007-2010 timeframe, there were no other venues within the Town of Windsor Locks that held nighttime parties/events with a comparable volume of people," no other venue in town required as much police attention as the Hotel, and no other venue in town had led the police to summon officers from other towns to assist. (Defs.' Ex. C, Rachelle Aff. ¶¶ 28-29.)

---

[15] Defendants state that "any such comment is vehemently denied." (Defs.' Reply Br. at 5.)

### C.      Count Three: Procedural Due Process

In Count Three, the Hotel brings a claim under Section 1983 against all Defendants for

violation of the Hotel's procedural due process rights. (Am. Compl. ¶¶ 78-84.) The Hotel alleges

that Defendants forced the closure of Club 91 "for ten months through threatened arrests and

directives" of Rachele, and that Defendants disrupted or closed down the bar or the Hotel

"several times for alleged liquor, health, or fire code violations." (*Id*. ¶ 80.)

"[T]o establish a procedural due process violation, [the Hotel] must: (1) identify a

property right, (2) establish that governmental action with respect to that property right amounted

to a deprivation, and (3) demonstrate that the deprivation occurred without due process." *Rosa R.*

*v. Connelly,* 889 F.2d 435, 438 (2d Cir.1989), *cert. denied,* 496 U.S. 941, 110 S.Ct. 3225, 110

L.Ed.2d 671 (1990). "To have a property interest in a benefit, a person clearly must have more

than an abstract need or desire and more than a unilateral expectation of it. He must, instead,

have a legitimate claim of entitlement to it. Such entitlements . . . are created and their

dimensions are defined by existing rules or understandings that stem from an independent source

such as state law." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005) (internal

quotations and citations omitted).[16]

The Hotel alleges that it has a property interest in operating its businesses (the hotel and

Club 91), and that the Defendants deprived it of this property interest "by closure or by

unjustified impediments and interferences" including "several key minority musical events

---

[16] The Hotel claims that the Defendants have deprived it "of its liberty and property interests" without procedural due process. (Am. Compl. ¶ 80.) Despite these allegations in the complaint, the Hotel does not brief, and provides no evidence of, a liberty interest.

during 2010," without notice or an opportunity to be heard. (Pls.' Opp. Br. at 23.)[17] While the

Hotel may have some property interest in operating its business—an issue I do not decide—any

such interest is, of course, subject to the fire, health, and other laws and regulations governing

business operations. In any event, as shown, the Hotel has offered no admissible evidence that

the *Defendants* shut down its operations or improperly influenced or "pressured" other agencies

to do so. The evidence in the record shows that the fire marshal's decision to shut down the hotel

on the evening of August 21, 2010, was made independently and as a result of serious fire code

violations. Further, a Connecticut statute expressly allows a municipal fire marshal to order that a

building be vacated in the event of risk of death or injury, and the Hotel nowhere suggests that it

is attacking the constitutionality of this statute—and it certainly does not brief that issue.[18]

Here, the parties agree that the Hotel had been on notice prior to August 21, 2010, that it

had outstanding fire code violations with respect to several doors. (Defs.' SMF ¶ 14; Pls.' SMF

---

[17] In its brief, the Hotel also suggests that the property interest is in the real property and ownership of the Hotel, which was later lost in a foreclosure, allegedly as a consequence of revenue losses caused by the Defendants' actions. If that is the property interest, though, the claim plainly fails, because there is no allegation or evidence that the Hotel did not receive all the process that it was due in the mortgage foreclosure process, which involves judicial proceedings and pre-deprivation hearings under Connecticut law. *See* Conn. Gen. Stat. §49-1 *et seq.*

[18] Conn. Gen. Stat. § 29-306(c) provides, in relevant part: "If the local fire marshal or a local police officer determines that there exists in a building a risk of death or injury from (1) blocked, insufficient or impeded egress, (2) failure to maintain or the shutting off of any fire protection or fire warning system required by the Fire Safety Code or State Fire Prevention Code . . . such fire marshal or police officer may issue a verbal or written order to immediately vacate the building. Such fire marshal or police officer shall notify or submit a copy of such order to the State Fire Marshal if such marshal or officer anticipates that any of the conditions specified . . . cannot be abated in four hours or less from the time of such order. Upon receipt of any such notification or copy, the State Fire Marshal shall review such order to vacate, and after consultation with the local fire marshal or local police officer, determine whether to uphold, modify or reverse such order, with any further conditions the State Fire Marshal deems appropriate to protect any person from injury." Such provisions are commonly upheld under an emergency exception to the rule requiring notice and pre-deprivation hearings. *See Parratt v. Taylor*, 451 U.S. 527, 538 (1981) ("[E]ither the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process.").

¶¶ 14, 17.) Moreover, the fire marshal's decision to invoke Conn. Gen. Stat. § 29-306(c) due to the risk of death or injury from the lack of operational fire warning system is afforded discretion. *Catanzaro v. Weiden*, 188 F.3d 56, 62 (2d Cir. 1999) ("the due process guarantee is offended only when an emergency procedure is invoked in an abusive and arbitrary manner; therefore, there is no constitutional violation unless the decision to invoke the emergency procedure amounts to an abuse of the constitutionally afforded discretion.")

Nor can the Hotel blame its inability to sell liquor at the Ludacris event on the Defendants. On June 4, 2010, at approximately 4:50pm, just before the event, Rachele advised the Hotel that its liquor permit had expired, and according to the Hotel, prevented bar employees from selling liquor that night under threats of criminal arrest. Plaintiffs allege that the Hotel recently changed its Permittee and, although it had received approval for this change from Liquor Control, it needed a seal from the Town, which it had not received or obtained as of June 4, 2010. (Pls.' SMF ¶ 14.) According to Jacobi, it "is common practice at the State Liquor Division [that] no violations for the technical lack of a permit with the new Permittee are issued in the interim, and [Hotel] personnel had been advised to leave the prior license with the old Permittee hanging until replaced by the new one." (Pls.' Stmt. Disputed Facts ¶ 12.) Again, these statements are vague, cite no admissible evidence, and provide no facts suggesting that Jacobi has personal knowledge of Liquor Control's practices. In short, the Hotel points to no evidence showing that it had a valid liquor license on June 4, 2010, and the Hotel does not have a property interest in operating a bar without a liquor license.

With respect to the shutdown of the bar in November 2008 following the swingers' event, this was done by Liquor Control and, again, there is no evidence that the Defendants improperly pressured Liquor Control to do so. Finally, as Defendants point out, "neither Jacobi himself, nor

the Permittee Brian True, could specifically identify any event that did not actually go forward because" of police conduct. (Defs.' Ex. A, Jacobi Tr. (July 31, 2013) at 81-82, 98-99; True Tr. at 177 (stating that the police blocked off the road "[a] couple of times," but he does not remember any events that were canceled or shut down because of that).)

### D.  Count Four: Fourth Amendment – Warrantless Searches and Seizures

In Count Four, the Hotel asserts that Rachele's "unannounced visits" "at all hours of the day" to "search for" "any purported violations of the health, liquor or fire codes" were warrantless and unreasonable searches. (Am. Compl. ¶ 88-89.) Further, the Hotel claims that "all arrest warrants" of True, Thompson, and Jacobi were the product of these warrantless searches and thus "fruit of the poisonous tree." (*Id.* ¶ 91-92.) The Hotel also claims that Rachele's illegal searches resulted in the shutting down of the Hotel's bar from December 2008 until October 2009. (*Id.* ¶ 93.) Finally, the Hotel claims that Suchocki and Rachele "prevented access" to the Hotel by "unjustifiably blocking access to the road leading to the Hotel," falsely advising potential customers that the parking lot of the Hotel was full, and intimidating customers with emergency lights and K-9 drug sniffing dogs. (*Id.* ¶ 94.)

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Absent a warrant, consent, or other exigent circumstances, law enforcement officers act unreasonably and thus unconstitutionally when they enter a commercial property to conduct a search for contraband or evidence of a crime." *Club Retro, L.L.C.*, 568 F.3d at 195 (citing *Donovan v. Dewey,* 452 U.S. 594, 598 n. 6 (1981)).

### 1.  Searches

"A search occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *Maryland v. Macon*, 472 U.S. 463, 469 (1985) (internal quotation marks and citations omitted).

The evidence in the record indicates that Rachele *did* make many visits to the Hotel, but on many of these occasions he (or the WLPD, generally) was called by Hotel staff or others to respond to complaints of criminal activity or noise. (*See*, e.g., Pls.' Ex. B, Narrative Police Report 07-4992; Rachele Aff.; Pls.' Ex. K, WLPD Narrative Report of Sgt. Michael Balfore at 68-69.) The Hotel attempts to downplay this—with Jacobi vaguely asserting in his declaration that the Hotel staff "did not often" summon the police (Jacobi Decl. ¶ 5 ("staff did not often call for police assistance with respect to matters involving hotel customers, employees or otherwise except on a limited as needed basis consistent with the type or number of calls for police help made by a typical hotel of the same size"))—but this is not sufficiently specific to rebut the evidence of specific calls summoning the police to the Hotel, which is documented in police reports and in Rachele's affidavit. (*See* Part I.B*., supra*.) It therefore does not raise a "genuine" issue of material fact. *See Brown*, 654 F.3d at 358 (the party opposing summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."). In many cases, then, Rachele and members of the WLPD were on the Hotel's property with the permission of the owner/operator of the hotel or its agents.

Moreover, the record indicates that when Rachele visited the Hotel, he mostly visited the bar or front desk area or hallways—all areas open to the public and in which the Hotel had no reasonable expectation of privacy. *Macon*, 472 U.S. at 469 (there is no reasonable expectation of privacy in areas of a store "where the public was invited to enter and to transact business"). Plaintiffs' Local Rule 56 statement nowhere specifies a "visit" or search of private or non-public

areas of the hotel, and it is not the Court's job to comb through the voluminous record in this

case to find one. *Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002) ("[p]erhaps

counsel . . . intends that we form an argument for him, by looking into the record to document

the 'facts' posited in his 'statement of the case,' and then examining various combinations of

these facts in the light of the legal doctrines he later mentions. But that is simply not our job, at

least in a counseled case."); *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d

Cir. 1999) (declining the "invitation" to "scour the record, research any legal theory that comes

to mind, and serve generally as an advocate for appellant"). Further, the Hotel cites no evidence

of Suchocki's personal involvement in the alleged "warrantless searches."[19]

### 2.   Seizures

"A seizure occurs when there is some meaningful interference with an individual's

possessory interests in the property seized." *Macon*, 472 U.S. at 469 (internal quotation marks

and citations omitted). The Hotel has failed to provide admissible evidence to support its

allegations that Suchocki and Rachele "prevented access" to the Hotel by blocking access to the

road leading to the Hotel, falsely advising potential customers that the parking lot was full, and

intimidating people with emergency lights and K-9 drug sniffing dogs. First, the parties agreed

that "[t]here was never an occasion where any K-9 unit was used to unreasonably harass patrons

of the club or hotel." (Defs.' SMF ¶ 22; Pls.' SMF ¶ 22.) Further, as discussed above, the Hotel

---

[19] Plaintiffs' statement of disputed facts points to Pls.' Ex. B, p. 13 and Ex. C, pp.16-18 for evidence of
Suchocki's direct involvement, but these two exhibits show only that 1) Rachele was assigned to
investigate and determine if there were any liquor law violations taking place at the Hotel after True
contacted Suchocki and told him that the Hotel was sponsoring dance nights on Fridays; and 2) Suchocki
sent copies of police reports to the Department of Consumer Protection in connection with liquor
violations at the Hotel.

has not provided evidence of specific events that were interrupted or shut down by Rachele or any other police officer.

### E.    Count Five: Municipal Liability Rachele's Constitutional Violations

In Count Five, the Hotel brings a claim under Section 1983 against the Town for municipal liability for Rachele's alleged constitutional violations. (Am. Compl. ¶¶ 98-103.) The Hotel claims that Rachele's unconstitutional acts "were authorized, encouraged or directed" by Suchocki and the Town, "through the direct involvement" by the Town's First Selectman, Warwick, evidencing an official Town "policy, custom and practice concerning events that attracted African-American and Hispanic or alternative lifestyle clientele." (*Id.* ¶ 99.) The Hotel also alleges that it has complained to Warwick about the alleged misconduct of Suchocki and Rachele, but the Town did not investigate or take any action based on its complaints. (*Id.* ¶ 100.) Further, the Hotel claims that the Town failed to train and/or supervise Suchocki and Rachele. (*Id.* ¶ 101.)

"[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Torraco v. Port Auth. of New York & New Jersey*, 615 F.3d 129, 140 (2d Cir. 2010).

On top of the flaws detailed above with respect to the Hotel's claims of constitutional violations, this claim fails for lack of evidence. There is no evidence in the record about the training and supervision of Suchocki and Rachele, and the only evidence in the record concerning Warwick is that he is allegedly mentioned in some police reports and in some of

Rachele's affidavits in support of several search warrants,[20] and that Brian True, who was the Permittee of the Hotel bar at one point, testified that Warwick met with Suchocki and Rachele across the street from the hotel on a few occasions. (True Tr. 167 (testifying that "I know my brother-in-law owns the restaurant pizzeria right across the street from the hotel" and "I know that there were times that we were having events that there would be Steve [Warwick], the chief, Detective Rachele . . . in my brother-in-law's parking lot before [the police] would come over.").) This is not evidence that a custom, policy, or practice of the Town caused the alleged constitutional violations. Further, although the police chief is sued individually, and there is evidence that that the police chief made a racist comment (an accusation Defendants deny), the Hotel does *not* allege in the amended complaint or argue in its brief that the police chief was the final decision-maker with respect to Town policy. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."). To the contrary, the Hotel argues that Warwick, the First Selectman, was the final decision-maker. (*See* Pls.' Opp. Br. at 34.) Thus, the Hotel's claims for municipal liability against the Town are dismissed.[21]

## F.    Count Seven: False Arrest/Malicious Prosecution by Jacobi Against All Defendants

In Count Seven, Jacobi brings a claim under Section 1983 against all Defendants for false arrest and malicious prosecution. (Am. Compl. ¶ 108-121.) Jacobi claims that Rachele's actions

---

[20] Plaintiffs' Disputed Issues of Material fact states that "Warwick's role is self-evident" in Rachele's Applications for Arrest Warrants & Police Reports. (Pls.' Stmt. Disputed Facts ¶ 2 (citing Pls.' Ex. I at 31-50; Ex. J at 51-61; Ex. K at 62-69; Ex. M at 96-99).) The Court, however, found no mention of Warwick's name or the position of First Selectman on any of the cited pages.

[21] Because they are duplicative, all claims against the individual officers in their official capacities are dismissed for the same reason that the claims against the Town are dismissed. *Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007) ("An official capacity suit against a public servant is treated as one against the governmental entity itself.") (internal citations omitted).

in arresting him were not supported by probable cause and were unreasonable. (*Id.* ¶¶ 109-10.)
Jacobi claims that the November 13, 2008 arrest warrant issued for Jacobi "contained material
false statements of fact or omissions," which misled the judge into signing the warrant.[22] (*Id.* ¶
111.)

Jacobi asserts that Rachele, knowingly or recklessly, made five critical omissions in his
affidavit with respect to the arrest that arose out of the November 8, 2008 swingers' event.
Specifically, Jacobi alleges that "Rachele knowingly and recklessly, with a complete disregard to
ascertain the truth," failed to tell the signing judge that:

1.      informant Lindquist was never asked for identification when he gave the Liquor
Control officers phony, doctored pictures purporting to show sexual acts taking place in
public areas of the Hotel on October 25, 2008;

2.      "no reasonable . . . police officer would believe that such activity would have
taken place . . . at a luxury hotel, in public areas," because it would hurt its business,
especially in light of the fact that, during the event actually observed by undercover
authorities on November 8, 2008, "no such activity [occurred] outside a tightly sealed off
bar area";

3.       "Moylan" was never questioned by Rachele "about his obsessive interest in
stopping HCP events at Club 91";

4.      the Hotel "was not a sleazy motel where unsavory sex and prostitution occur but a
gorgeous hotel renovated at a cost of millions of dollars"; and

5.      the true identity of informant Lindquist was John Moylan, an operator of a
competing swingers' group, who had a criminal record.

---

[22] Although Plaintiffs mention three arrests in the Amended Complaint, they make specific allegations
and brief only the arrest that arose out of the November 8, 2008 swingers' event. Therefore, the Court
deems the claims based on the other two arrests waived. *See Willoughby*, 2012 WL 3726532, at *8 ("the
onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in
summary judgment are deemed abandoned.").

(*Id.* ¶ 112.) Jacobi's Amended Complaint further alleges that, after arresting him, the Defendants "falsely and maliciously pursued and prosecuted charges" against him "[e]ven after the Liquor Commission learned of John Moylan's true identity . . . ." (*Id.* ¶ 115.) Finally, Jacobi alleges that all of the charges against him were dismissed. (*Id.* ¶ 118.)

In analyzing § 1983 claims for false arrest and malicious prosecution, federal courts generally borrow the elements of those claims from state law. *Washington v. Cnty. of Rockland*, 373 F.3d 310, 315 (2d Cir. 2004) ("Although § 1983 provides plaintiffs with a federal cause of action, generally we borrow the elements of the underlying malicious prosecution from state law."); *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004) ("In analyzing § 1983 claims for unconstitutional false arrest, we have generally looked to the law of the state in which the arrest occurred."). "In a false arrest action, Connecticut law places the burden of proving an unlawful arrest on the plaintiff. And, in Connecticut, a false arrest claim cannot lie when the challenged arrest was supported by probable cause." *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (internal citations and quotation marks omitted). Similarly, to establish a claim for malicious prosecution under Connecticut law, one of the elements a plaintiff must prove is that the defendant acted without probable cause. *Holman v. Cascio*, 390 F. Supp. 2d 120, 122 (D. Conn. 2005).

> Under both federal and Connecticut law, probable cause to arrest exists when police officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. Thus, probable cause does not demand that an officer's good-faith belief that a suspect has committed or is committing a crime be correct or more likely true than false. It requires only facts sufficient to establish the sort of fair probability on which reasonable and prudent [people,] not legal technicians, act.

*Zalaski v. City of Hartford*, 723 F.3d 382, 389-90 (2d Cir. 2013) (internal citations and quotation marks omitted). Because probable cause is a required element of both false arrest and malicious

40

prosecution and because Jacobi cannot show that the Defendants lacked probable cause, his claim fails.

On November 13, 2008, an arrest warrant was issued for Jacobi, charging him with Criminal Liability to Commit Obscenity in violation of Conn. Gen. Stat. §§ 53a-9 and 53a-194 and Criminal Liability to Commit Public Indecency in violation of Conn. Gen. Stat. §§ 53a-9 and 53a-186 for events "which took place on or about the date of 11-8-08." (Pls.' Ex. I, Affidavit for Jacobi Arrest Warrant p. 4, ECF No. 91 at 33; Defs.' Ex. D1, Colla Report, ECF No. 84-3 at 41.) There was probable cause to arrest Jacobi based on the information in Rachele's affidavit, which set forth, among other things, that: 1) the Hotel was owned and operated by Jacobi; 2) the WLPD had received information that on weekends, for the past several months, "swingers groups" had been renting out Club 91, and the Hotel owner and permittee allowed these groups to collect admission fees from attendees and close the doors of the bar to the public, and allowed attendees to engage in sexual activities in the bar; 3) that Liquor Control had received e-mails from Lindquist containing photographs of people engaged in sex acts that Lindquist said were taken in Club 91 and in the lobby of the Hotel over the past several weeks; 4) that Agents Colla and Lewis attended, undercover, a swingers' party at Club 91 on November 8, 2008, where they observed specific instances of people engaged in sex acts; 5) when the promoter of the party, Nick Maulucci, was interviewed by the Liquor Control agents and Rachele, he said that "he had entered into a contract with Sharok Jacobi to have his parties at the hotel and that Jacobi was fully aware of the parties and what was taking place in Club 91 and the lobby of the hotel"; and 6) that under the Liquor Control Regulations, neither Club 91 nor the Hotel can close the doors to the public while Club 91 is open for business. (Pls.' Ex. I, Affidavit for Jacobi Arrest Warrant p. 1-4, ECF No. 91 at 30-33.) Further, the alleged omissions are either immaterial to the probable

41

cause determination or relate to information not known to the police when the affidavit was signed. First, the fact that Lindquist was never asked for identification was, if anything, a failing by the Liquor Control agents who met with him, not the Defendants, and this fact does not by itself strip the information "Lindquist" provided of all credibility. (*See* Defs.' Ex. D1, Colla Report, ECF No. 84-3 at 35 (Colla reported that he and Liquor Control Agent Lewis met with Lindquist at a Dunkin Donuts in Wethersfield at 11pm on October 10, 2008, and Lindquist did not have any identification).) Second, Plaintiff's assertion that "no reasonable police officer" would believe that swingers' parties at which sex was occurring in public areas might happen at a "luxury hotel" or a "gorgeous hotel" is, at best, an opinion—and not one supported by the evidence in the record. It is, in any event, not a material fact. And the fact that the sexual conduct on November 8 all happened in the bar area—while signs saying "private party" were at the entrances—hardly means that on a previous occasion it did not spill out into other areas, as the photos in Rachele's possession apparently suggested.[23] Third, the fact that Rachele himself did not question Lindquist/Moylan, and relied upon the Liquor Control agents to do so, was not a material fact either—absent evidence, and none has been provided, that the Liquor Control agents were incompetent or unreliable. Fourth, there is no evidence that Rachele knew, at the time he signed the arrest warrant affidavit, that the informant was actually associated with a competing swingers' group. Colla received that information in an anonymous e-mail from "Whistle Blower" on November, 22, 2008, (Defs.' Ex. D1, Colla Report p. 7, ECF No. 84-3 at 41), and the warrant affidavit was dated nine days earlier. (Pls.' Ex. I, Affidavit for Jacobi Arrest Warrant p. 1-4, ECF No. 91 at 30-33.) Finally, in spite of Jacobi's occasional suggestions that he did not know the details of the swingers' activities, the evidence shows that Maulucci told

---

[23] This is also not a material fact because the conduct observed in the bar itself on November 8, 2008, was sufficient to establish probable cause for a violation of the public indecency statute. (*See* note 24, *infra*.)

Rachele and the Liquor Control agents "that Jacobi was fully aware of the parties and what was taking place in Club 91 and the lobby of the hotel." (Pls.' Ex. I, Affidavit for Jacobi Arrest Warrant p. 3, ECF No. 91 at 32.) Furthermore, the Liquor Control narrative report shows that Liquor Control agents met with Jacobi on September 23, 2008, and informed him of the information they had received from Lindquist about inappropriate conduct on the premises. According to the report, "Mr. Jacobi stated that he was willing to comply with the liquor laws and that the advertised conduct does not happen within his hotel. Mr. Jacobi was given a current Liquor Control Act and Regulation book. I marked section 30-6-A24 and showed him the sections where no persons may not be unclothed and that no one is allowed to perform or simulate a[] sexual act on the permit premises. (Exception being private sleeping accommodation rooms) We discussed at length what acceptable conduct is and what is not allowed under the liquor control law."[24] (Defs.' Ex. D1, Colla Report p. 1, ECF No. 84-3 at 35.)

---

[24] Although Jacobi alleges in the Amended Complaint that "the defendants falsely and maliciously pursued and prosecuted the charges in the Superior Court of the State of Connecticut . . . . *[e]ven after* the Liquor Commission learned of John Moylan' true identity and motives and harbored suspicious about the October 2008 pictures" (Am. Compl. ¶ 115 (emphasis added)), he does not include in his brief any argument that the police were required to drop the prosecution after learning about the true identity of "Mark Lindquist." Instead, his brief focuses on two arguments 1) that the proceedings terminated in favor of Jacobi, and 2) that Rachele lacked probable cause when he swore to the affidavit submitted in support of the arrest warrant—over a week before Liquor Control learned of Lindquist's true identity. I therefore need not address the issue whether the defendants' subsequent receipt of information casting doubt on the credibility of information received from Lindquist—including the photos purportedly showing sexual activities in areas of the hotel more likely to be visible to routine guests and visitors—meant that the continuation of the prosecution was malicious and lacking in probable cause. Nonetheless, it is at least worth noting that the events personally observed by the Liquor Control agents on November 8, 2008, *by themselves* likely continued to infuse the prosecution of Jacobi with probable cause—even if all information received from Lindquist were discarded. Section 53a-186 of the Connecticut General Statutes—the violation of which was one of the charges against Jacobi—makes a person guilty of "public indecency" "when he performs any of the following acts in a public place: (1) An act of sexual intercourse as defined in subdivision (2) of section 53a-65 [as including fellatio or cunnilingus]; (2) a lewd exposure of the body with intent to arouse or to satisfy the sexual desire of the person; or (3) a lewd fondling or caress of the body of another person." Conn. Gen. Stat. § 53a-186. The statute provides that "[f]or purposes of this section, 'public place' means any place where the conduct may reasonably be expected to be viewed by others." The investigative report by the Liquor Control agents describes

### G.      Count Eight: Violation of the Constitution of the State of Connecticut

That leaves only the state constitutional claims asserted by the Plaintiffs (Count Eight). [25] Because Plaintiffs have not provided any separate analysis under the Connecticut Constitution or claimed that any of the state constitutional provisions cited in the Amended Complaint provide Plaintiffs with greater protection than the analogous federal constitutional provisions discussed above, these claims fail as a matter of law for the reasons set forth above. *See State v. Gore,* 288 Conn. 770, 776 n. 7, 955 A.2d 1 (2008) ("Because the defendant has not provided a separate analysis of the right under the state constitution, and has not claimed that the state provisions provide greater protection than their federal counterparts, . . . we treat the . . . rights arising from the state and federal constitutions as coextensive."); *Lenox v. Town of N. Branford*, No. 3:08CV01448 DJS, 2012 WL 6102470, at *16 (D. Conn. Dec. 7, 2012) (vacated in part on other grounds after court granted motion for reconsideration) ("Plaintiff has not argued that his rights are broader under the Connecticut Constitution than under the United States Constitution. Therefore, this Court assumes that the Plaintiff's speech rights under the state constitution are coextensive with his speech rights under the Federal Constitution.").

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court GRANTS Defendants' motion (ECF No. 84) for summary judgment. The Clerk is directed to close this case.

---

activities that fit this description, and Maulucci's statement to the police that Jacobi, the Hotel's principal, was aware of the activities gave the police probable cause to charge him as an accessory.

[25] In Count Six, the Hotel brings a claim for attorneys' fees under 42 U.S.C. § 1988, which provides that, in any action or proceeding to enforce a provision of 42 U.S.C. § 1983 "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs . . . ." 42 U.S.C § 1988. Because the Court has granted Defendants' summary judgment claims on all of the Section 1983 claims, Plaintiffs are not prevailing parties. Count Six is thus dismissed.

IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              September 30, 2015